**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL AMERICAN INSURANCE COMPANY, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 13 CV 1290 |
| v. | ) |
| | ) Magistrate Judge Michael T. Mason |
| THE PROGRESSIVE CORPORATION and ARTISAN AND TRUCKERS CASUALTY COMPANY, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

National American Insurance Company ("NAICO") has sued the Progressive Corporation and Artisan & Truckers Casualty Company ("Artisan"), seeking to recover money NAICO paid out on behalf of its insured, which it claims Artisan should have paid. The case is before the Court on cross-motions for summary judgment. For the reasons explained below, NAICO's motion [31] is granted, and Artisan's motion [44] is denied.

## Background

On August 23, 2010, the truck Gustavo Bernal was driving was hit from behind by a semi truck tractor. Gustavo and his wife Maria, who was riding with him at the time, were both injured. A few months later, in October 2010, the Bernals sued Viktor Barengolts and Eduard Gaidishev, who were in the truck at the time of the crash; they also sued Michael Barengolts, who owned the truck at the time of the crash, and Unlimited Carrier, whose placards were on the truck at the time of the crash. *See Bernal v. Unlimited Carrier et al.*, No. 10 L 822, Second Amended Complaint, filed in the

Circuit Court of Will County, Illinois (NAICO's Statement of Facts, Exhibit A-1; Artisan's Statement of Facts, Exhibit B). There is some question about who was driving the truck at the time of the accident – whether it was Viktor or Eduard; but there is no question that, at the time of the crash, the truck carried placards bearing a United States Department of Transportation ("USDOT") number registered to Unlimited Carrier.

Two insurance policies were potentially at play in the *Bernal* litigation – one issued by NAICO to Unlimited Carrier and one issued by Artisan to Viktor Barengolts. The NAICO policy, commercial truckers liability policy number SL05050112, was effective from December 7, 2009 to December 7, 2010 and provided liability coverage for "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." NAICO Policy Number SL05050112, Section II(A) (attached as Exhibit A-2 to Plaintiff's Statement of Facts). Covered autos, as defined in the policy, included "owned autos" and "hired autos" – those leased, hired, rented or borrowed by the insured – as well as autos that were owned by the insured's employees and not owned, leased, hired, rented or borrowed by the insured, "but only while used in your business or your personal affairs." *Id.*, Section I(A).

The Artisan Policy issued to Viktor Barengolts (policy number 07572918-0) lists Viktor as the insured and as a "related driver"; it also lists Michael Barengolts as an "additional insured" and it lists Michael's truck, the 2001 Volvo (VIN number 4V4NC9TJ11N312861) in the "auto coverage schedule." *See* Artisan Policy No. 07572918-0, p. 2 (Plaintiff's Statement of Facts, Exhibit C-A; Defendant's Statement of

2

Facts, Exhibit F).   Under the policy, Artisan agreed to "pay damages, OTHER THAN

PUNITIVE OR EXEMPLARY DAMAGES, for bodily injury, property damage, and

covered pollution cost or expense, for which an insured becomes legally responsible

because of an accident arising out of the ownership, maintenance or use of an insured

auto."  *Id.*, p. 8.   The parties do not dispute that Viktor is an insured, that the Volvo semi

tractor is an insured auto, or that the accident involving the Bernals arose out of the use

of that auto.

The Artisan policy also includes a "Contingent Liability Endorsement" that

provides:

> Except as specifically modified in this Endorsement, all provisions of the
> Commercial Auto Policy apply.
>
> We agree with you that the insurance provided under your Commercial
> Auto Policy is modified as follows:
>
> We agree with you that the provisions of the policy relating to Bodily Injury
> Liability and Property Damage Liability are subject to the following
> limitations:
>
> Liability coverage for an insured auto described in the Declarations is
> changed as follows:
>
> 1.  These coverages do not apply when the insured auto is being
> operated, maintained or used for or on behalf of anyone else or any
> organization whether or not for compensation.
>
> 2.  These coverages do not apply when the insured auto is being used to
> transport goods or merchandise, or while the goods or merchandise are
> being loaded and unloaded from the insured auto.
>
> ALL OTHER TERMS, LIMITS AND PROVISIONS OF THE POLICY
> REMAIN UNCHANGED.

*Id.*, p. 20 (Plaintiff's Statement of Facts, Exhibit C-A; Defendant's Statement of Facts at

Exhibit F).

3

Initially, the defense of the suit was tendered to NAICO, which investigated the accident and surrounding circumstances. NAICO, which assumed the defense pursuant to a reservation of rights, learned that the lease agreement between Unlimited Carrier and Michael Barengolts was not yet in place at the time of the accident; it wasn't signed until August 31, 2010, more than a week after the accident. According to NAICO, Unlimited Carrier's placards were not authorized until that agreement was signed. Nevertheless, NAICO defended its insured in the *Bernal* lawsuit and, on behalf of Unlimited Carrier, Viktor Barengotls, Michael Barengolts and Eduard Gaidishev, ultimately settled with the Bernals for a total of almost $100,000 (it paid $50,000 to Gustavo and $48,750 to Maria).

Immediately after the Bernals filed suit, Viktor contacted Artisan directly about coverage. On October 25, 2010, Artisan wrote to him advising that the claims were not covered because, at the time of the accident, he was driving on behalf of Unlimited Carrier. See Plaintiff's Statement of Facts, Group Exhibit A-4. Despite this, counsel for Unlimited Carrier and counsel for Viktor Barengolts repeatedly requested that Artisan get involved in the lawsuit, but Artisan repeatedly declined.

On January 7, 2011, counsel for Unlimited Carrier wrote to Artisan demanding that it defend Viktor Barengolts under the policy issued to him. *See* Plaintiff's Statement of Facts, Group Exhibit A-3. In a letter dated January 27, 2011, Artisan refused. On April 8, 2011, counsel for Mr. Barengolts wrote to Artisan tendering the defense and requesting copies of any documents, photographs or statements in its possession that supported its decision to deny coverage in connection with the *Bernal* lawsuit. Group Exhibit A-3. In a letter sent April 13, 2011, Artisan again refused. Group Exhibit A-4.

4

Counsel for Mr. Barengolts reiterated his tender of the defense and indemnity in a letter dated August 18, 2011. That letter advised Artisan that both Viktor and Michael Barengolts would look to Artisan for reimbursement of any defense costs, including attorney's fees, and any amounts paid in settlement or in judgment in the suit. Group Exhibit A-3. Three days later, Artisan sent another refusal letter, reiterating its position that the Contingent Liability Endorsement operated to exclude coverage for the claims. Group Exhibit A-4.

On February 17, 2012, counsel for the Barengoltses again wrote to Artisan advising that the lease agreement between Unlimited Carrier and Michael Barengolts (which counsel attached) was not signed until 8 days after the accident with the Bernals. *Id.* Based upon this, counsel once again tendered the defense and indemnity of both Viktor and Michael Barengolts. Artisan again denied the tender, representing that the lease date changed nothing with respect to the Contingent Liability Endorsement. Group Exhibit A-4. On March 18, 2012, counsel for the Barengoltses again wrote to Artisan advising that he disagreed with the position Artisan was taking. See Group Exhibit A-3. On May 3, 2012, Artisan responded with another denial. See Group Exhibit A-4.

After the court denied both parties' motions in the *Bernal* lawsuit, finding that issues of fact remained as to whether Michael and Viktor Barengolts were agents of Unlimited Carrier at the time of the incident, counsel for the Barengoltses again tendered the defense and indemnity to Artisan. *See* September 25, 2012 letter from Gary M. Feiereisel to Kelly C. Chec (attached as part of Exhibit A) . Artisan again declined.

On February 19, 2013, after the *Bernal* litigation was resolved, NAICO filed suit in this court, seeking to recover defense and indemnity costs it alleges Artisan should have paid on behalf of its insured. NAICO seeks a declaratory judgment that Artisan breached its duty to defend and indemnify its insureds, Viktor Barengolts and Michael Barengolts, in the *Bernal* lawsuit; NAICO's complaint also includes claims to recover defense and indemnity expenses based upon equitable subrogation (count II), contractual subrogation (count III) and equitable contribution (count IV). Artisan answered the complaint, denying that it had any obligation to defend or indemnify; it also filed a counterclaim, seeking a declaratory judgment that coverage does not exist under its policy for the Bernals' claims, that NAICO properly defended and indemnified against the underlying *Bernal* lawsuit and that NAICO is not entitled to any reimbursement from Artisan for defense or indemnification costs.

The case is before the Court on cross motions for summary judgment. NAICO argues that the allegations in the Bernals' complaint triggered Artisan's duty to defend, as provided by the plain language of the policy issued to Viktor Barengolts. Artisan argues just the opposite – that under the plain terms of the policy it had no duty to defend.

### Discussion

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, the Court does not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty*

6

*Lobby, Inc.,* 477 U.S. 242, 249 (1986). The Court views all evidence and draws all inferences in favor of the non-moving party, and may enter summary judgment only if the record as a whole establishes that no reasonable jury could find for the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

NAICO argues that it is entitled to summary judgment with respect to both Artisan's duty to defend and Artisan's duty to indemnify; it argues that, under the plain language of Artisan's policy, Artisan was on the hook for both defense and indemnification. Artisan argues that the plain language of its policy clearly excludes coverage, thereby eliminating any duty to defend or indemnify its insureds for the Bernals' claims.

A.    Artisan's Duty to Defend

There is no dispute that Illinois law governs the insurance policies at issue in this case. In Illinois, an insurer's duty to defend its insured is broader than its duty to indemnify. *E.g., Hilco Trading, LLC v. Liberty Surplus Insurance Corp.*, No. 1-12-3503, — N.E.3d —, 2014 WL 1028536, at *8 (Ill. App. Ct. March 17, 2014)(citing *West Bend Mutual Insurance Co. v. Sundance Homes, Inc.*, 606 N.E.2d 326, 327 (Ill. App. Ct. 1992)). To determine whether the duty to defend has been triggered, we look to the allegations in the complaint and compare them with the language of the policy. *Northfield Insurance Co. v. City of Waukegan*, 701 F.3d 1124, 1129 (7th Cir. 2012)(citing *General Agents Insurance Co. Of America, Inc. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005)). "[A]n insurer has a duty to defend the insured if the underlying complaint alleges facts that fall within, or potentially within, the policy's coverage. " *Menard, Inc. v. Country Preferred Insurance Co.*, 992 N.E.2d 643, 648 (Ill.

7

App. Ct. 2013)(citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992)). And, if "the complaint alleges several causes of action or theories of recovery against an insured," the duty to defend is triggered if even one of those causes of action or theories of recovery is within the scope of coverage." *Maryland Casualty Co v. Peppers*, 355 N.E.2d 24, 28 (Ill. 1976), *cited in Pekin Insurance Co. v. Kiefer Landscaping, LLC*, No. 5-12-0588, 2014 WL 272845, at *2 (Ill. App. Ct. Jan. 23, 2014). "Both the policy terms and the allegations in the underlying complaint are liberally construed in favor of the insured, and any doubts and ambiguities are resolved against the insurer." *Amerisure Mutual Insurance Co. v. Microplastics, Inc.*, 622 F.3d 806. 811 (7th Cir. 2010)(citing *State Farm Fire and Casualty Co. v. Perez*, 899 N.E.2d 1231, 1235 (Ill. App. Ct. 2008); *Pekin Insurance Co. v. Beu*, 876 N.E.2d 167, 170 (Ill. App. Ct. 2007)).

Here, the relevant complaint is the one filed by Gustavo and Maria Bernal in the Will County action. It includes eight counts, though many of the counts have overlapping allegations. All of the counts allege that, on August 23, 2010, Gustavo Bernal was operating a pick up truck and attached trailer eastbound on Route 30 just west of its intersection with 119th Street in Wheatland Township, Will County, Illinois, with Maria Bernal riding as a passenger in the truck. *Bernal v. Unlimited Carrier, Inc., et al.*, No. 10 L 822, Second Amended Complaint, e.g., Count I, ¶¶1, 2. The counts all allege that there was a collision between the Bernals' truck and a truck that was placarded with a USDOT number that was registered to Unlimited Carrier, that the collision, through no negligence on the part of the plaintiffs, caused them to suffer damages in excess of $50,000 each.

More specifically, counts I and II of the complaint allege that, on that date, Viktor Barengolts was operating a tractor with VIN 4V4NC9TJ11N312861 and USDOT registration number 1701017, a number that was registered to Unlimited Carrier; that he was operating the tractor "as an agent and/or employee of Unlimited Carrier"; that he was operating the tractor "within the course and scope of his employment and/or agency relationship with Unlimited Carrier"; and that, in his capacity as an agent of Unlimited Carrier, he committed various acts of negligence (e.g., speeding, failing to slow down, failing stop), causing a collision that resulted in injuries to the plaintiffs. *Id.*, Count I, ¶¶6-7, 11-13 (Gustavo), Count II, ¶¶6-7, 11-13 (Maria).

Counts III and IV are identical, except that they allege that Eduard Gaidishev was driving at the time of the accident; these counts allege that Gaidishev was operating the tractor as an agent and/or employee of, and in the course and scope of his employment and/or agency relationship with, Unlimited Carrier, and that, in his capacity as an agent and/or employee of Unlimited Carrier, he committed various acts of negligence, causing a collision and injuries to the plaintiffs. *Id.*, Count III, ¶¶7-8, 12-14; Count IV, ¶¶7-8, 12-14.

Counts V and VI allege that, at the time of the accident, the tractor was being driven by Viktor Barengolts, but was owned by Michael Barengolts; they allege that, at the time of the accident, Viktor was operating the tractor "as the agent and/or servant of Michael Barengolts" and that, at the time of the accident, Viktor was "within the course and scope of his employment and/or agency relationship with Unlimited Carrier." Count V, ¶¶3-5 (Gustavo), Count VI, ¶¶ 3-6 (Maria). They allege that, in his capacity as the agent and/or servant of Michael Barengolts, Viktor committed various acts of

negligence, causing a collision and injuring the plaintiffs. *Id.*, Count V, ¶¶9-11 (Gustavo), Count VI, ¶¶10-12 (Maria). Counts VII and VIII are identical, except that they allege that Gaidishev, and not Viktor, was operating the tractor as Michael's agent and/or employee, and that, in that capacity as agent and/or servant of Michael Barengolts, committed various acts of negligence, causing the collision and injuries to the Bernals. *Id.*, Count VII, ¶¶3-5, 9-11 (Gustavo), Count VIII, ¶¶3-5, 9-11 (Maria).

NAICO argues that, because the Bernals' complaint alleges alternatively that, at the time of the accident, the truck was being driven on behalf of Unlimited Carrier or on behalf of Michael Barengolts, it triggered a duty to defend on the part of Artisan. Artisan disagrees, arguing that all of the counts – no matter the differences in the particular allegations – allege that, at the time of the accident, the truck was "under the authority and control" of Unlimited Carrier; this means, according to Artisan, that, under the plain terms of the policy, Artisan did not have a duty to defend or indemnify. To support its argument, Artisan relies upon the Contingent Liability Endorsement cited above.

To determine whether a particular insurance coverage exclusion applies, we look to general rules of contract interpretation. *E.g., Netherlands Insurance Co. v. Phusion Projects, Inc.*, 737 F.3d 1174, 1177 (7th Cir. 2013)(citing *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433, 930 N.E.2d 999, 1003-1004 (2010)). The Court's "primary function" in interpreting an insurance policy "is to ascertain and give effect to the intent of the parties as expressed in the contract"; "[i]f the language of the insurance policy is unambiguous and does not offend public policy, the provision will be applied as written." *Netherlands*, 737 F.3d at 1177 (citing *Munoz*, 930 N.E.2d at 1003-1004).

The Contingent Liability Endorsement in Artisan's policy excludes coverage "when the insured auto is being operated, maintained or used for or on behalf of anyone else or any organization whether or not for compensation." No one is suggesting that the exclusion is ambiguous, and the Court finds that it is not ambiguous. A close examination of the Bernals' allegations, read against this endorsement, shows that at least some of the claims – specifically, counts V, VI, VII and VIII, which allege that the driver, in the capacity of agent and/or servant of Michael Barengolts, committed various acts of negligence causing the collision and resulting damages – potentially fall outside of the exclusion and would, therefore, be covered.

Artisan argues that, even these claims, allege that Viktor or Eduard were, at the time of the accident, within the course and scope of their employment and/or agency relationship with Unlimited Carrier. That is true, but that is not what the Contingent Liability Endorsement excludes. The exclusion applies if the insured auto is being operated for or on behalf of anyone else. Although the allegations of the complaint do not track the language of the exclusion precisely, it is clear that counts I through IV would fall within the scope of the exclusion – they allege that the driver (whether it was Viktor or Eduard) was driving as an agent or employee of Unlimited Carrier, while acting within the scope of his employment with Unlimited Carrier, and that, in their capacity as agents or employees of Unlimited Carrier they committed various acts of negligence causing the claimed damages. The only reasonable way to read these allegations is that they allege that the driver was operating the insured auto on behalf of Unlimited Carrier. But the same cannot be said of the allegations in counts IV through VIII. Although all of the counts allege that the driver was, at the time of the accident, "within

the course and scope of his employment and/or agency relationship with Unlimited Carrier" only the first four counts allege that the driver was operating the truck as an agent or employee of (that is, on behalf of) Unlimited Carrier. The other counts allege that the driver was operating the truck as an agent or employee of (that is, on behalf of) Michael Barengolts.[1]

Artisan argues that the complaint alleges in all counts that, at all times relevant to this dispute, the truck was under Unlimited Carrier's "authority and control." But the policy language does not exclude coverage when the truck is under someone else's authority and control; it excludes coverage when the truck is being operated, maintained or used for or on behalf of anyone else or any organization, and that is not necessarily the same thing. The truck could, in theory, be under the authority and control of Unlimited Carrier (because of the presence of Unlimited Carrier's placards on the truck) and still be operated or used on a particular outing on behalf of Michael Barengolts, as alleged, or even for the insured's own personal reasons. The record before the Court shows that, despite the presence of the placards on the truck, the legal relationship between Michael and Unlimited Carrier had not been solidified and the truck was not yet authorized to carry Unlimited Carrier's placards, though it did. Under those circumstances, despite the presence of the placards, the truck cannot be said to have been operated for or on behalf of Unlimited Carrier at that time. Given that the complaint's allegations and the policy language must both be construed in favor of the

---

[1]Significantly, Artisan does not argue that Michael Barengolts would fall within the definition of "anyone else or any organization" and rightly so, given that he is a named insured and the owner of the insured auto.

insured, the Court finds that the allegations in counts V through VIII potentially fall within the scope of coverage.  Accordingly, Artisan was wrong to refuse to defend its insured and its persistent refusal to defend based upon the Contingent Liability Endorsement was unreasonable.

B.    Artisan's Duty to Indemnify

As we've noted above, the duty to defend is much broader than the duty to indemnify.  If there is no duty to defend, there can be no duty to indemnify.  But our finding that Artisan had a duty to defend does not necessarily mean it had a duty to indemnify.  Having determined that Artisan had a duty to defend (because the allegations in the complaint potentially fell within the scope of coverage), we must now consider whether it also had a duty to indemnify (because the claims actually fell within the scope of coverage).

Artisan argues that the concept of "placard liability" absolves it of any liability. "Placard Liability" – also called "logo liability"  – "operates to hold federally authorized carriers . . . that are licensed by the United States Department of Transportation (USDOT) and display their USDOT certificate number on their trucks, vicariously liable for the negligence of drivers operating under a lease."  *U.S. Bank v. Lindsey*, 920 N.E.2d 515, 525 (Ill. App. Ct. 2009)(citing *Schedler v. Rowley Interstate Transportation Co.*, 368 N.E.2d 1287 (1977); *Kreider Truck Service, Inc. v. Augustine*, 394 N.E.2d 1179; *Fulton v. Terra Cotta Truck Service, Inc.*, 639 N.E.2d 1380 (1994)).   The point of "placard liability"  – and, indeed, of the Interstate Commerce Act – "is to make a carrier under the Act liable for those injuries caused to the traveling public which arise out of the negligence operation of any vehicle leased to it and operated under its ICC permit."

13

*Lindsey*, 920 N.E.2d at 525 (citing *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28 (1975)).   Thus, the doctrine of "placard liability" means that Unlimited Carrier would be liable to the Bernals for damage caused by the truck that crashed into them because the truck was carrying Unlimited Carrier's logos or placards at the time of the crash.   But the doctrine says nothing about whether NAICO, as Unlimited Carrier's insurer, has the right to seek reimbursement from Artisan, which insured the truck itself and (maybe) the driver.   Thus, Artisan's argument to the contrary notwithstanding, the doctrine of placard liability does not end the matter.   Although the doctrine ensures that the Bernals get compensated for their damages, the doctrine does not affect NAICO's right to seek reimbursement from Artisan for money it expended to cover the Bernals' damages.

Under the plain terms of the policy – and as Artisan admits – "Artisan insured the subject tractor, but <u>not</u> while it was "being operated, maintained, or used for or on behalf of anyone else or any organizations whether or not for compensation."   Defendant's Combined Memorandum of Law, p. 1 (emphasis in original).   The question of whether the truck was being "operated, maintained, or used for or on behalf of anyone else or any organizations whether or not for compensation" requires consideration of more than just the placards on the truck.   Resolution of that question requires consideration of all of the evidence in the record – the deposition testimony, as well as the documentary and photographic evidence in the case.

There is at least one piece of concrete evidence to suggest that the truck was being operated on behalf of Unlimited Carrier at the time of the accident: the photographs taken at the time of the accident show that the placards bearing Unlimited

14

Carrier's USDOT number were on the truck. On the flip side, there is at least one piece of concrete evidence to suggest that the truck was not yet authorized to be operated on behalf of Unlimited Carrier at the time of the accident: the lease agreement between Michael Barengolts and Unlimited Carrier was signed August 31, 2010 – after the accident. The testimony does little to clear up the issue.

At his deposition, Michael Barengolts testified that his first contact with Unlimited Carrier occurred the Friday before the accident; he testified that he and Viktor went to prepare paperwork and have the truck checked out. Deposition of Michael Barengolts, p. 24 (attached as Exhibit E to plaintiff's Statement of Facts). Michael testified that he and Viktor went to Unlimited Carrier's Lansing facility (he thinks) on August 20th with the truck, and that at that time they were given some numbers for the truck, which they put on over the weekend. *Id.,* pp. 24-27, 31-33. Michael testified that he signed the lease agreement with Unlimited Carrier on August 31, 2010, but that it was his understanding the lease should have been signed on August 20th, when he and Viktor met with Unlimited Carrier for the first time. *Id.*, pp. 53-54, 57-58.

Michael testified that, on the morning of August 23rd, when he dropped Viktor and Eduard off at the parking lot where he kept the truck parked, it was his understanding that they were going to an Unlimited Carrier facility – maybe Lansing, maybe another facility. *Id.*, pp. 63-64. He testified that, the morning of the accident, Viktor told him they were going to Unlimited Carrier. P. 66. He testified that it was his understanding that they were going there for "starting work or finish what still open question or some papers. But this was close to or close or ready to work." *Id.*, p. 66. Michael testified that, at the time of the accident, his truck had the Unlimited Carrier sticker on it. *Id.*, p.

15

73.  He testified, looking at the pictures of the truck post-accident, that the stickers on the truck were those he received from Unlimited Carrier and that the stickers were on the truck at the time of the accident, that he and Viktor put them on the truck after their meeting with Unlimited Carrier, some time over the weekend of August 20-22.  *Id.*, pp. 137-138.

Michael also testified that, after the accident, Artisan came to inspect the truck and paid for the repairs needed to fix the damage done to the truck in the accident; he testified that the repairs cost about $5,000.  *Id.*, pp. 71, 75-77.

Michael testified that, at the time of the accident, he did not have an executed lease agreement with Unlimited Carrier.  *Id.*, p. 124.  He testified that, when he and Viktor went to Unlimited Carrier on August 20th, they didn't have an executed lease agreement; nor did they have an executed lease agreement when they put the stickers on the truck that weekend.  *Id.*, pp. 123-124.   He testified that he signed the lease agreement on August 31st and understood the lease would not begin until that date. *Id.*, p. 125.   Michael also testified that no one at Unlimited Carrier told him he was no longer supposed to drive his truck for personal use or business once he put the Unlimited Carrier sticker on the truck.  *Id.*, p. 136.

Viktor testified that he first heard about Unlimited Carrier when he finished driving school in May of 2010.  Deposition of Viktor Barengolts, p. 22 (attached as Exhibit F to plaintiff's Statement of Facts).  He testified that he looked them up in the yellow pages, went to their facility in Lansing, Illinois and got hired that next week.  V. Barengolts Dep., pp. 22-23.  He testified that he went to Unlimited Carrier, probably the first week of May, and was hired some time around the 8th of May; he testified that, at that time, he

completed a lot of paperwork, including an owner-operator agreement. *Id.*, pp. 24-25, 27. He testified that, at that time, he did not own a truck, neither did his father, but he nonetheless signed the agreement because that is the way things are done in Illinois; he explained that he was actually hired as a subcontractor, not as a driver for the company. *Id.*, p. 33-34. He testified that, after he was hired by Unlimited Carrier, before the accident, he drove their trucks; then, after his father bought the Volvo truck, he planned to drive that truck for the company. *Id.*, pp. 34-35.

Viktor testified that, in an ordinary work day, he would be notified by the dispatcher concerning the available loads, and then he would "stop by the company, you bring all your paperwork from the truck to see if it's not expired, see if the truck don't have any repairs or issues, and since we checked everything, you receiving the load, where to pick up, on the yard or other place, and go." *Id.*, pp. 36-37. He testified that Michael's truck had never been to the Lansing facility of Unlimited Carrier. *Id.*, p. 52. He testified that they did not take the truck to any Unlimited Carrier facility on August 20, 2010 – it never went there before the accident. *Id.*, p. 52.

Viktor testified that a week before the accident, he went to the Unlimited Carrier facility in Lansing to pick up the stickers for the Volvo truck. *Id.*, p. 55; he testified that he went by himself, without Michael. *Id.* He testified that he put the stickers on over the weekend. *Id.*, p. 57; he testified that he put the stickers on both the driver's side of the truck and the passenger's side of the truck. *Id.*, p. 58. He testified that either Friday August 20th, or early in the morning on Monday, August 23rd, he spoke to someone at Unlimited Carrier – the manager of the owner-operator staff, *Id.*, p. 65. Viktor testified

that he called him because he "want to make sure when I come over there I start to work." *Id.*, p. 66.

Viktor testified that, on the morning of the accident (August 23), he woke up at 7:00 and planned to go the Unlimited Carrier facility in Lansing.  V. Barengolts Dep., p. 69.  He testified that he was supposed to be coming to the yard that day and that, "[p]robably before the accident happened, we got the paperwork signed in and he told me exactly which day they expected me.  Otherwise, I not have any idea.  I know just take the truck and just go, it never happen., It's too much money." *Id.*, p. 69.

Viktor testified that, the morning of the accident, his father Michael drove him and Eduard to the truck, and then Eduard got in the driver's seat and he got in the passenger seat.  *Id.*, p. 74.  He testified that, within a couple of minutes of Eduard pulling away, he climbed into the sleeping compartment and laid down. *Id.*  He testified that, before the accident, he was lying down behind the seats and then he sat up and looked out the window; he testified that Eduard told him he slowed because the Bernals were stopped completely.  *Id.,* p. 77.  He testified that, at the time of the accident, Eduard was driving Michael's truck.  *Id.*  He testified that he told Eduard to move, and Eduard slid over into the passenger seat.  Then Viktor exited the truck through the driver's side and went to see if the people were ok. *Id.*, p. 78.  He testified that a police officer then came over and told him to move the truck to the side so traffic could pass; he got in the driver's side and moved the truck; after he parked, then Eduard got out of the truck and was "running around like a crazy person."  *Id.*, pp. 79-81.  Viktor testified that the first police officer just asked them to move the cars and then he left; three additional police cars then arrived on the scene.  *Id.,* pp. 82-83.

18

Viktor testified that he told the police officer on the scene that he was driving the truck; he testified that "my mind was on the truck, not on the police officer's questions." *Id.*, p. 87. Viktor testified that, in connection with the accident, he was issued tickets for driving too fast and for failing to reduce speed; he testified that he pled guilty to those offenses. *Id.*, p. 91. He testified that the Illinois State Police did a "driver vehicle examination report" after the accident, *Id.,* pp. 92-93.

Viktor was asked, "when you left that morning from the Star Trucking place, did you know that you were going to be driving the truck for Unlimited Carrier that day?" And he answered "[a]ctually, sometimes they surprise people. But, you know, 50-50 I was being a chance." *Id.*, p. 93.

Viktor testified that he and Eduard both worked for Unlimited Carrier as drivers, and that, at one point, after Michael bought the truck, they stopped being company drivers and were becoming owners/operators. *Id.*, pp. 107-109. He testified that this accident happened in between the time he had been fired as a company driver and the time he had carried his first load for Unlimited Carrier as an owner-operator. *Id.,* pp. 109-110. On this issue, the record includes the Owner/Operator Agreement Viktor signed with Unlimited Carrier on May 8th; what it doesn't include is any documentary evidence showing that the agreement was terminated before the accident. There is a letter in the record, written on Unlimited Carrier letterhead, terminating Viktor's employment with the company, but it is dated September 20, 2010. *See* Artisan's Statement of Facts, Exhibit C-5, p. 31.

Viktor testified that "[a]t the time of the accident, yeah, probably. Yeah, I wasn't working for Unlimited Carrier. That's what I'm trying to tell. On this day I wasn't work

for Unlimited Carrier.  I was driving to Unlimited Carrier for interview, whatever they need to finish up, and not working." V. Barengolts Dep., p. 111.  Along this line, the record includes a statement from Viktor in which he represents that, on August 23, 2010, he "was not under dispatch and was not driving for Unlimited Carrier, Inc. at the time of the accident." Artisan's Statement of Facts, Exhibit C5, p. 32.

Viktor testified that Unlimited Carrier told him "to take the case out of the shoulders of Unlimited Carrier to my shoulders so whatever is happening, I pay.  They say they can repay my check.  Actually, two of them." V. Barengolts Dep., pp. 122-123. He testified that Unlimited Carrier told him to say false things to Artisan – "don't involve us." *Id.*, p. 123.  He testified that he pled guilty on the tickets even though he wasn't driving because he "want to be over with that already.  It was like stupid mistake." *Id.*, p. 129.

Dovydas "David" Apanavicius testified that he works for Unlimited Carrier and has done so since approximately 2008, starting as a driver and most recently as customer relations manager and safety director.  Apanavicius Dep., pp. 12-14, 18-20 (attached as Exhibit G to plaintiff's Rule 56.1 Statement of Facts).   He testified that, in his capacity as safety director, he was responsible for overseeing safety department operations – made sure the company was DOT compliant, handled things as they came up. *Id.*, p. 20.

Apanavicius testified that, when a driver or owner/operator is terminated, Unlimited Carrier's safety director would remove the placards and/or conduct the visual inspection to see if the placards are removed from the vehicle.  *Id.*, pp. 42.  He testified that, when he was the safety director, that was his responsibility.  *Id.*, p. 43, He testified

that, to his knowledge, Unlimited Carrier never had a situation where a person who was terminated failed to remove the placards. *Id.*, p. 45.

Apanavicius testified that, at one point, Viktor and Eduard were both driving for Unlimited Carrier, and that, at some point, Viktor asked him if it was ok if they both drove Michael's truck. *Id.*, p. 65. Apanavicius testified that, in accordance with the owner/operator agreement, upon termination, the driver was required to surrender a binder containing a bunch of paperwork for Unlimited Carrier – permits to enter certain states and Canada, a fuel card, the IFTA sticker, insurance, etc. *Id.*, pp. 76-77. He testified that Viktor did this when he stopped driving under the agreement signed May 8, 2010 and started driving his father's truck. *Id.*, p. 77.

Apanavicius testified that a truck is supposed to be placarded before its driver "can be dispatched under Unlimited Carrier's freight." *Id.*, p. 98. And that, as a general practice, he would have conducted a physical inspection of the truck to ensure that it had been properly placarded; he testified that he recalls inspecting Michael's truck for placards, but could not recall when he did so. *Id.*, pp. 98-99.

He testified that he saw the police report prepared in connection with the accident, but he could not remember when he saw it. *Id.*, pp. 99-100. He testified that Viktor did not come to the Lansing, Illinois facility the day of the accident. *Id.*, p. 100. He testified that, as he recalled, Michael came to Lansing a week or two weeks after the accident; he testified that he recalled the accident caused damage to the truck, which needed to be fixed before he could pass DOT inspection; he testified the truck could not be operated until it passed inspection. *Id.*, pp. 102-103. Apanavicius testified that Unlimited Carrier and Michael Barengolts entered into only one lease agreement. *Id.*, p.

21

104. He testified that, according to the logbooks, Viktor and Eduard drove Michael's truck for Unlimited Carrier in September 2010. *Id.*, p. 104.

Apanavicius testified that, as far as he knew, at the time of the accident, Viktor "was driving for his own personal reasons." *Id.*, p. 104. He testified that Viktor was not under dispatch for Unlimited Carrier at the time of the accident, or at any time during the month of August. *Id.*, pp. 109-110.

Apanavicius testified that he was never told who was driving the truck at the time of the accident; he does not know who was driving. *Id.*, p. 133. He testified that he called Viktor to get a statement from him – to clarify what his statement was for insurance purposes. *Id.,* p. 134. He testified that, to his knowledge, neither Viktor, nor Michael nor Eduard was ever fined for having the Unlimited Carrier placard on their truck at the time of the accident. *Id.*, p. 139. He testified that he wrote a statement for Viktor to sign saying he wasn't operating under Unlimited Carrier's placard at the time of the accident. *Id.*, p. 143. He testified that he did not know Michael's truck was placarded with Unlimited Carrier's placard at the time of the accident; he learned about the placards after the accident, when it came up because of insurance. *Id.,* pp. 145-146.

Viktor's testimony – which lacks credibility in many respects – seems to say both that he was, and that he wasn't operating the truck on behalf of Unlimited Carrier at the time of the accident – just as his testimony seems to say both that he was and was not driving the truck the morning of the accident. Apanavicius claims the truck was not being "operated, maintained or used for or on behalf of" Unlimited Carrier at the time of the accident, though he admits that Viktor and Eduard did drive Michael's truck for and

on behalf of Unlimited Carrier at some point.  And he admits that the presence of Unlimited Carrier's placards on the truck meant that the truck was operating on behalf of Unlimited Carrier.  Michael testified that Viktor was going to Unlimited Carrier to pick up a load that day – which is consistent with what Viktor says at one point.  Yet Michael also admits that he didn't have a signed agreement with Unlimited Carrier at the time of the accident – something Apanavicius testified was necessary before a truck could be operated on behalf of the company.  In short, there remains a genuine issue of fact as to whether the truck was, in fact, being "operated, maintained or used for or on behalf of" Unlimited Carrier at the time of the accident.

Having said all of that, whether the Bernals' claim was, in fact, covered by the Artisan policy is, at this point, irrelevant.  Under Illinois law, when a defense is tendered, an insurer has several options: it can seek a declaratory judgment before trial of the underlying action, it can defend the insured under a reservation of rights or it can refuse to defend.  *E.g., Petersen Sand and Gravel, Inc. v. Maryland Casualty Co.*, 881 F.Supp. 309, 313 (N.D. Ill. 1995) (citing *Maneikis v. St. Paul Insurance Co.*, 655 F.2d 818, 821 (7th Cir. 1981))*, cited in Prisco Serena Sturm Architects, Ltd. v. Liberty Mutual Insurance Co.*, No. 94 C 5716, 1996 WL 114785, at *4 (March 14, 1996).  If it opts for the latter, it "does so at its peril" should it later be determined that it did so wrongfully.  Petersen, 881 F.Supp. at 313.  *See also Home Federal Savings Bank v. Ticor Title Insurance Co.*, 695 F.3d 725, 735-736 (7th Cir. 2012).   An insurer that violates its duty to defend is estopped from denying policy coverage in a subsequent lawsuit by the insured or the insured's assignee.  *Eclipse Manufacturing Co. v. United States Compliance Co.*, 886 N.E.2d 349, 358 (Ill. App. Ct. 2007); *LaGrange Memorial Hospital*

*v, St. Paul Insurance Co.*, 740 N.E.2d 21, 31 (Ill. App. Ct. 2000)(citing *Maneikis v. St. Paul Insurance Co.*, 655 F.2d 818, 821-822 (7th Cir. 1981)); *Petersen*, 881 F.Supp. at 313. Thus, as a practical matter, Artisan is on the hook for indemnification, as well as defense costs.

C.    Damages

Having determined that Artisan must reimburse NAICO for defense and indemnification costs, the Court must next decide the amount of that reimbursement award. NAICO argues that, at a minimum, given the respective policy provisions, Artisan should be required to reimburse 50% of what NAICO incurred to settle and defend the *Bernal* suit. Alternatively, NAICO argues that its policy is excess of any coverage from Artisan, and that Artisan should, therefore, be required to reimburse all of the defense and settlement costs. Sticking to its guns, Artisan argues that it has no duty to defend and no duty to indemnify, therefore, it has no duty to reimburse NAICO for anything.

NAICO's complaint includes claims for contractual subrogation, equitable subrogation and equitable contribution. "Subrogation has been defined as the substitution of another person in the place of a claimant whose rights he succeeds to in relation to the debt or claim asserted, which he has paid involuntarily." *Wausau Insurance Co. v. All Chicagoland Moving & Storage Co.*, 777 N.E.2d 1062, 1067 (Ill. App. Ct. 2002)(citing *North American Insurance Co. v. Kemper National Insurance Co.*, 758 N.E.2d 856, 859 (2001)). The prerequisites to subrogation are: "(1) a third party must be primarily liable to the insured for the loss; (2) the insurer must be secondarily liable to the insured for the loss under an insurance policy; and (3) the insurer must

have paid the insured under that policy, thereby extinguishing the debt of the third party." *Wausau Insurance*, 777 N.E.2d at 1067; *North American*, 758 N.E.2d at 859 (citing *State Farm General Insurance Co. v. Stewart*, 681 N.E.2d 625 (Ill. App. Ct. 1997)).

The NAICO policy includes a "transfer of rights" provision, which states that "[i]f any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us.  That person . . . must do everything necessary to secure our rights and must do nothing after 'accident' or 'loss' to impair them."  NAICO Policy No. SL05050112, Section V(A)(5)(Exhibit A-2, p. 61).  And, consistent with the transfer of rights provision, Viktor Barengolts executed an assignment on November 18, 2012, assigning to NAICO "all rights, claims, and causes of action against [Artisan]" including those arising out of the failure to provide a defense or coverage in connection with the Bernals' lawsuit.  *See* Exhibit H to Plaintiff's Statement of Facts.   These documents would allow NAICO to pursue a contractual subrogation claim.

Additionally, under at least some of the factual scenarios spelled out in the Bernals' complaint, the express provisions of the respective policies would have made Artisan's coverage primary and NAICO's coverage excess.  The Artisan policy provided that "[f]or any insured auto that is specifically described on the Declarations Page, this policy provides primary coverage.  For an insured auto which is not specifically described on the Declarations Page, coverage under this policy will be excess over any and all other valid and collectible insurance, whether primary, excess or contingent."  Artisan Policy Number, General Provisions Section, ¶3(a) (attached as Exhibit C-A to

25

Plaintiff's Statement of Facts, p. 16).  Michael's truck was specifically described on the Declarations Page.  See *id.*, p. 2.  The NAICO policy provided that coverage was primary for any covered auto owned by Unlimited Carrier, and excess for any covered auto not owned by Unlimited Carrier.  *See* NAICO Policy Number SL05050112, Section V(B)(5)(e).  Accordingly, the prerequisites for contractual subrogation are all present, and the Court finds that NAICO is entitled to reimbursement of all costs incurred in defending and indemnifying the Barengoltses in connection with the Bernals' lawsuit.

### Conclusion

For the reasons explained above, the Court finds that Artisan had a duty to defend its insured in the lawsuit filed by the Bernals and that it breached that duty when it repeatedly refused to accept the defense of the suit.  Additionally, the Court finds that, as a result of this breach, Artisan is estopped from asserting any coverage defenses under its policy and that NAICO is entitled to reimbursement from Artisan for all costs incurred in connection with its defense and indemnity of the Bernals' claims. Accordingly, Artisan's motion for summary judgment [44] is denied and NAICO's motion for summary judgment [31] is granted.

With respect to the exact amount of the judgment,  NAICO's complaint alleges that it settled the Bernals' claims for $98,750 and it spent "approximately $60,000" to defend Viktor and Michael Barengolts in the *Bernal* lawsuit.  But the exact defense costs are not disclosed in the complaint (or in NAICO's summary judgment submissions). Accordingly, the Court is unable to set the amount of the judgment at this time.  The case is set for a status hearing on June 11, 2014 at 9:00 a.m. for the purpose of addressing the issue.

26

Dated: May 15, 2014

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge